# United States Court of Appeals

*for the*

# Federal Circuit

2012-5090, -5091, -5092, -5093,
-5094 and -5095

ARACOMA COAL COMPANY, BANDMILL COAL CORPORATION,
SPARTAN MINING COMPANY, STIRRAT COAL COMPANY, BLACK
STALLION COAL COMPANY, LLC, COYOTE COAL COMPANY, LLC,
DODGE HILL MINING COMPANY, LLC, HIGHLAND MINING COMPANY,
LLC, KANAWHA EAGLE COAL, LLC, PANTHER, LLC,

*(For Continuation of Caption See Inside Cover)*

APPEALS FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN
CONSOLIDATED CASE NOS. 09-CV-734, 09-CV-770, 05-CV-1284, 07-CV-266,
05-CV-929 AND 05-CV-1211, SENIOR JUDGE BOHDAN A. FUTEY

## JOINT REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

JOHN YATES MERRELL, JR.
MERRELL & MERRELL, P.C.
1477 Chain Bridge Road, Suite 101
P.O. Box 1111
McLean, Virginia 22101
(703) 790-8440

*Attorneys for Plaintiff-Appellant
    Appeal 2012-5134*

ROBERT M. ROLFE
HUNTON & WILLIAMS LLP
951 East Byrd Street
Riverfront Plaza, East Tower
Richmond, Virginia 23219
(804) 788-8466

*Attorneys for Plaintiffs-Appellants
    Appeal 2012-5121*

January 17, 2013

STEVEN HARLAN BECKER
BECKER LAW FIRM PLLC
600 Third Avenue
New York, New York 10016
(212) 499-9098

– and –

CHARLES H. CRITCHLOW
LINDSAY A. MINNIS
BAKER & MCKENZIE LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 626-4100

*Attorneys for Plaintiffs-Appellants
    Appeals 2012-5090, -5091,
    -5092, -5093, -5094, -5095 and
    2012-5133*

JUPITER HOLDINGS, LLC, REMINGTON, LLC, WILDCAT, LLC, CONSOL ENERGY, INC., CONSOLIDATION COAL COMPANY, CONSOL OF PENNSYLVANIA COAL COMPANY, CONSOL OF KENTUCKY INC., EIGHTY FOUR MINING COMPANY, HELVETIA COAL COMPANY, ISLAND CREEK COAL COMPANY, KENT COAL MINING COMPANY, LAUREL RUN MINING COMPANY, NINEVAH COAL COMPANY, EAGLE ENERGY, INC., ELK RUN COAL COMPANY, INC., GOALS COAL COMPANY, GREEN VALLEY COAL COMPANY, INDEPENDENCE COAL COMPANY, INC., KNOX CREEK COAL CORPORATION, MARKFORK COAL COMPANY, INC., MARTIN COUNTY COAL CORPORATION, PEERLESS EAGLE COAL COMPANY, PERFORMANCE COAL COMPANY, RAWL SALES & PROCESSING, CO., SIDNEY COAL COMPANY, INC., STONE MINING COMPANY, APOGEE COAL, COVENANT COAL CORP., JIM WALTER RESOURCES, INC., ALEX ENERGY, INC., DELBARTON MINING COMPANY, COLONY BAY COAL COMPANY, LOGAN FORK COAL COMPANY, PINE RIDGE COAL COMPANY, RIVERS EDGE MINING, INC., ANDALEX RESOURCES, INC., ARCH WESTERN RESOURCES, LLC, CANYON FUEL COMPANY, LLC, CATENARY COAL COMPANY N/K/A CATENARY COAL COMPANY, LLC, CLINTWOOD ELKHORN MINING COMPANY, COAL-MAC, INC., COASTAL COAL COMPANY, LLC N/K/A ENTERPRISE MINING COMPANY, LLC, COASTAL COAL-WEST VIRGINIA, LLC N/K/A BROOKS RUN MINING COMPANY, LLC, DAL-TEX COAL CORPORATION, EASTERN ASSOCIATED COAL CORPORATION N/K/A EASTERN ASSOCIATED COAL, LLC, EVERGREEN MINING COMPANY, GATLIFF COAL COMPANY, GENWAL RESOURCES, INC., GLAMORGAN COAL COMPANY, LLC, HOBET MINING, INC., N/K/A HOBET MINING, LLC, KEYSTONE COAL MINING CORPORATION, KINGSTON RESOURCES, INC., MCELROY COAL COMPANY, MINGO LOGAN COAL CO., MOUNTAINEER COAL DEVELOPMENT COMPANY, NICHOLAS-CLAY COMPANY, LLC, N/K/A AMVEST WEST VIRGINIA COAL, LLC, NICHOLAS-CLAY LAND & MINERAL, INC., OLD BEN COAL COMPANY, PACIFIC COAST COAL COMPANY, PAYNTER BRANCH MINING, INC., PERRY COUNTY COAL CORPORATION, PIONEER FUEL CORPORATION, PLATEAU MINING CORPORATION, PREMIER ELKHORN COAL COMPANY, QUARTO MINING COMPANY, RAG CUMBERLAND RESOURCES, L.P. N/K/A CUMBERLAND COAL RESOURCES, L.P., RAG EMERALD RESOURCES, L.P., N/K/A EMERALD COAL RESOURCES, L.P., RIVERSIDE ENERGY, INC. N/K/A AMCI HOLDINGS, INC., SHIPYARD RIVER COAL TERMINAL COMPANY, TERRY EAGLE L.P., UNITED STATES STEEL MINING COMPANY LLC, USIBELLI COAL MINE, INC., VIRGINIA CREWS COAL COMPANY, and WEST RIDGE RESOURCES, INC.,

*Plaintiffs-Appellants,*

– and –

POWDER RIVER COAL COMPANY, PEABODY HOLDING COMPANY, INC., MID-VOL LEASING, INC., and TWENTYMILE COAL COMPANY,

*Plaintiffs-Appellants*,

– v. –

UNITED STATES,

*Defendant-Appellee*.

2012-5121

CLINCHFIELD COAL COMPANY, ELKAY MINING COMPANY,
HEARTLAND COAL COMPANY, HOLSTON MINING COMPANY,
MEADOW RIVER COAL COMPANY, MOTIVATION COAL COMPANY,
PARAMONT COAL CORPORATION, PYXIS RESOURCES CORPORATION,
RANGER FUEL CORPORATION, and SEA "B" MINING COMPANY,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN CASE NO. 02-CV-069, JUDGE LYNN J. BUSH

2012-5133

MINGO LOGAN COAL COMPANY,

*Plaintiff-Appellant,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN CASE NO. 00-CV-0761, JUDGE FRANCIS M. ALLEGRA

2012-5134

RED RIVER COAL COMPANY, INC.,

*Plaintiff-Appellant,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN CASE NO. 01-CV-0441, JUDGE GEORGE W. MILLER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................ii

SUMMARY OF ARGUMENT ............................................................................1

ARGUMENT .......................................................................................................4

   I. Regardless of the Newly Construed Meaning of "Coal Produced," OSM
      Actually Applied the Tax Upon The Processed Coal Product Sold By
      Producers Rather Than Coal Extracted .......................................................4

     A. OSM's Regulations Prescribe a Tax on The Processed Coal Product
        When Sold ..............................................................................................5

     B. OSM's Actual Application of the Tax Has Been on The Processed
        Coal Product When Sold ........................................................................8

     C. The Reclamation Fee Is Not an Extraction Tax That Is Deferred Until
        Sale -- It Is Imposed On The Processed Coal Product When Sold
        Because It is Upon the Condition of That Coal, Rather Than Raw
        Coal at Extraction, That OSM Assesses the Tax ...................................12

     D. The *Drummond* Courts' Finding That OSM Actually Imposed the
        Tax on Coal Has Retained Its Relevance Notwithstanding *Consol*
        *III's* Application of the Constitutional Avoidance Canon to
        Reinterpret "Coal Produced"................................................................16

     E. *Liggett* Provides No Valid Authority for Holding That OSM Imposes
        the Tax On Coal Extracted, and Its Adoption by *Consol V* Opens a
        Wide Gap in Export Clause Protection .................................................18

  II. *Consol V* Misapplied the Constitutional Avoidance Canon By Deeming
      OSM's Application of the Tax to Be on Coal Extracted When In Fact
      OSM Has Yet to Conform Its Regulations and Practice to This New
      Interpretation of Coal Produced ...............................................................23

  III. *Consol V* Failed to Apply the Standard Required By The Supreme Court
      In Evaluating OSM's Interpretation of the Statute and Its Own
      Regulations ...............................................................................................24

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ammex, Inc. v. United States,*
    419 F.3d 1342 (Fed. Cir. 2005) ....................................................19

*Auer v. Robbins,*
    519 U.S. 452 (1997)......................................................................24

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)................................................................17, 23

*Consolidation Coal Co. v. United States* ("*Consol III*"),
    528 F.3d 1344 (Fed. Cir. 2008) ...........................................*passim*

*Consolidation Coal Co. v. United States* ("*Consol V*"),
    615 F.3d 1378 (Fed. Cir. 2010), *reh'g and reh'g en banc denied,*
    (October 12, 2010), *cert. denied,* 131 S. Ct. 2990 (2011) ...................*passim*

*Cyprus Amax Coal Co. v. United States,*
    205 F.3d 1369 (Fed. Cir. 2000), *reh'g denied,* June 8, 2000*, cert.*
    *denied U.S. v. Cyprus Amax Coal Co.,* 532 U.S. 1065 (2001)....................22

*Drummond Coal Co. v. Hodel,*
    610 F. Supp. 1489 (D.D.C. 1985), *aff'd,* 796 F.2d 503
    (D.C. Cir. 1986) ........................................................12, 16, 17, 18

*Edward J. De Bartolo Corp. v.*
    *Florida Gulf Coast Bldg. & Const. Trades Council,*
    485 U.S. 568 (1988)......................................................................23

*Fairbank v. United States,*
    181 U.S. 283 (1901)........................................................................1

*Kwong Hai Chew v. Colding,*
    344 U.S. 590 (1953)........................................................................3

*Liggett & Myers Tobacco Co. v. United States,*
    299 U.S. 383 (1937).................................................................*passim*

*McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco,*
    *Dept. of Bus. Regulation of Florida,*
    496 U.S. 18 (1990)........................................................................22

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)....................................................................17

*Nufarm America's, Inc. v. United States*,
    521 F.3d 1366 (Fed. Cir. 2008) ..............................................*passim*

*Reynolds Tobacco Co. v. Robertson*,
    94 F.2d 167 (4th Cir. 1938) ..................................................19, 21

*Richfield Oil Corp. v. State Bd. of Equalization*,
    329 U.S. 69 (1946).....................................................................2, 7

*United States v. IBM*,
    517 U.S. 843 (1996)........................................................19, 21, 22

*United States v. U.S. Shoe Corp.*,
    523 U.S. 360 (1998).................................................1, 19, 21, 22

*Wyodak Resources Development Corp. v. United States*,
    637 F.3d 1127 (10th Cir. 2011) ...............................................8, 9

**Statutes & Other Authorities:**

U.S. Const. Art. I, § 9, cl. 5.....................................................................1

28 U.S.C. § 1491 ....................................................................................22

19 C.F.R. § 181.53 .................................................................................13

19 C.F.R. § 181.53(a)(2)(i)(A)............................................................13, 19

30 C.F.R. § 870.13 ...............................................................................8, 11

30 C.F.R. § 870.12(a)-(b).........................................................................7

30 C.F.R. § 870.12(b)(3)(i)......................................................................7

69 Fed. Reg. 56,122, 56,127-56,128 (Sept. 17, 2004)........................8, 10

73 Fed. Reg. 67,631 (November 14, 2008) .......................................8, 11

## SUMMARY OF ARGUMENT

Review by the *en banc* Court and its overruling of the panel's decision in *Consolidation Coal Co. v. United States*, 615 F.3d 1378 (Fed. Cir. 2010), *reh'g and reh'g en banc denied* (October 12, 2010), *cert. denied*, 131 S.Ct. 2990 (2011) ("*Consol V*"), are warranted for several independent reasons in two principal categories, none of which has been rebutted by the government.

First, the panel's decision to rely on *Liggett & Myers Tobacco Co. v United States,* 299 U.S. 383 (1937), and apply a governmental immunity analysis to evaluate the coal tax, directly conflicts with long-standing Supreme Court precedent establishing that the Export Clause is unique, and bars *any* burden whatsoever on exports. *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998); *Fairbank v. United States*, 181 U.S. 283, 292-93 (1901). The panel's limitation of the protection afforded exports, to only those taxes that impose a "*direct burden* on the *state,*" ignores the express language and purpose of the Export Clause, which provides: "*No* Tax or Duty shall be laid on *Articles exported from any State.*" U.S. Const. Art. I, § 9, cl. 5 (emphasis added).

The panel also wrongly followed *Liggett's* holding that because the tobacco tax is not a sales tax, it must be imposed on the manufacture of tobacco, and only its collection is deferred until sale. But the application of this sales tax analysis, too, conflicts with the Export Clause jurisprudence of the Supreme Court and this

Circuit. The panel should have focused on the fact that OSM's regulations do not impose the tax on coal not based on its condition upon extraction, but rather based on the processed coal product in its condition -- weight, value, grade, and presence of non-extracted substances -- at the time of *sale*. Thus, the object of the tax, as determined by its "operation and effect," *see Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 84 (1946), is that product when sold. Consistent with that logic, this Circuit recently determined that whether duty is imposed on a good upon importation and merely deferred until export, or actually imposed upon export in violation of the Export Clause, depends on whether the tax is assessed on the good in its condition as imported, or in its condition as exported. *Nufarm America's, Inc. v. United States,* 521 F.3d 1366, 1369 (Fed. Cir. 2008). *Consol V* ignores these crucial Export Clause standards.

The panel's startling adoption of *Liggett*'s governmental immunity analysis to address Export Clause violations, and its abandonment of the *Richfield* and *Nufarm* criteria for identifying the subject of an export tax, have opened an unsupportable gap in export protection. This is an issue of exceptional importance that urgently warrants *en banc* review, because if left undisturbed, the panel's new rule will allow the government to raise new taxes on exports (or restore recently invalidated ones), confident that they will not be struck down as long as they are not "sales taxes" or otherwise calculated on an *ad valorem* basis.

Second, and further warranting *en banc* review, the panel applied the canon of constitutional avoidance in order to deem OSM to have imposed the tax in a manner consistent with the revised interpretation of the statutory term "coal produced," when in reality, the agency through its regulations has consistently and unambiguously imposed the tax on the processed coal product when sold. That represents a substantial deviation from the application of the canon by the Supreme Court and other appellate courts, which typically deem prior agency action to be in violation of a statute or regulation in order to avoid a separate constitutional challenge to either. *See, e.g., Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953). Those courts did not re-characterize the agency action, as did *Consol V*, as being consistent with a constitutionally permissible reading of a statute, when in fact it is not.

Roundly criticized by the Constitutional Law Professors[1], and left virtually undefended in the government's answering brief, the panel's unprecedented mis-application of the canon has broad and adverse implications for the universe of those subject to administrative rulemaking and action. If a statutory term may be interpreted either in a manner that violates the Constitution or in a manner that does not, an agency can employ the same term in its regulations but then proceed

---

[1] See Brief of Constitutional Law Professors as Amici Curiae in Support of Petitioner (filed in the Supreme Court on March 16, 2011 seeking review of *Consol V*) (hereinafter "Constitutional Law Professors"), accessible at http://scholarship.law.duke.edu/faculty_scholarship/2699/

to ignore it –while promulgating further regulations prescribing action to be performed in the unconstitutional manner. *Consol V* deems the prescribed action to be constitutional, on the strength of the presumption that because the same ambiguous term appears in both the statute and the regulations, the term has the same meaning in both places.

By so ignoring the reality of the agency's actual regulations and conduct, *Consol V* departs from judicial precedent to such a degree, and with such adverse implications for the fair administration of government, that *en banc* review is warranted.

## ARGUMENT

I. **Regardless of the Newly Construed Meaning of "Coal Produced," OSM Actually Applied the Tax Upon The Processed Coal Product Sold By Producers Rather Than Coal Extracted**

The producers and Constitutional Law Professors have demonstrated that *Consol V* rejected producers' claims by conclusively presuming, in the name of constitutional avoidance, that OSM has imposed the tax in accordance with the narrowing construction of the statute required by *Consolidation Coal Co. v. United States*, 528 F.3d 1344 (Fed. Cir. 2008)(*Consol III*). The panel did this by deeming irrelevant, as a matter of the law, the uncontested facts of OSM's actual practice, which is to impose the tax on the processed coal product when it is sold in the export stream. *Consol V*, at 1382.

4

The government has failed to rebut this demonstration of the panel's error. Nowhere in its brief has the government justified the panel's application of the avoidance canon to redeem regulations that can only reasonably be interpreted as taxing the sale of a processed coal product, or to redeem agency conduct actually applying those regulations. Nor has the government shown that *Liggett* supports under an Export Clause analysis the panel's finding that the tax was imposed on extraction, but merely "deferred" until the coal was sold for export.

Indeed, the panel's finding conflicts with this Court's determination in *Nufarm* that a significant factor in determining an Export Clause violation is whether the tax is assessed based on the condition of the good being exported or the condition of the good prior to export. 521 F.3d at 1369. *Consol V* ignored the significance of OSM's imposition of the tax on coal in its condition when sold for export, which distinctly differs from the condition of coal when extracted.

## A. OSM's Regulations Prescribe a Tax on The Processed Coal Product When Sold

The government has defensively wrapped itself in the cloak of the *Consol V* panel's conclusion that the "term ['coal produced'] in the regulation must be construed consistent with the identical term in the statute." Gov't. Br., at 12 (citing *Consol V*, at 1382). It offers no valid explanation or independent support for the panel's presumption.

5

As did the panel, the government ignores that while the term "coal produced" appears in its reclamation fee regulations, OSM thereafter prescribes rules for taxation that impart an entirely different meaning than coal extracted. Pursuant to those regulations, the agency's actual practice has been to impose and collect the tax on the processed coal product when sold.[2] Thus, the regulatory term "coal produced" cannot be construed consistent with the identical term and its new statutory interpretation. In short, while "coal produced" may in the abstract be ambiguous and subject to interpretation under the doctrine of constitutional avoidance, in reality, OSM's regulations and conduct have in the past interpreted and applied "coal produced" to mean the sale of processed coal. The doctrine of constitutional avoidance does not permit the Court to rewrite history.

It remains uncontested that OSM's regulations have always unambiguously calculated the tax not merely at the time of sale[3], but also based on the weight and

---

[2] OSM has made no effort to revise its regulations to conform with *Consol III's* narrowing definition of "coal produced" as "coal extracted." However, even had it eliminated the provisions imposing the tax on coal when sold, it would not have cured the Export Clause violations resulting from the agency's 35-year long application of the regulations in their current form, or relieved the government of its liability to the producers for damages in the amount of the unconstitutional taxes.

[3] OSM's regulations do not merely defer until sale the collection a tax imposed on extraction. Their requirement that the tax be calculated based on the weight and value and grade of a processed product -- a distinctly different commercial product than raw extracted coal – renders the tax an imposition on coal when sold. The

value of the coal at sale, 30 C.F.R. § 870.12(a)-(b), based on the materials present at sale (regardless if they were extracted) and exclusive of the materials not present at sale (also regardless if they were extracted). 30 C.F.R. § 870.12(b)(3)(i). When sold, this coal is a processed product commercially distinct from raw extracted coal.

The regulatory provisions thus negate any nexus between the tax and the raw extracted coal, whereas they establish every *conceivable* nexus with the processed coal product when sold. They plainly render the tax, in "operation and effect," *Richfield Oil*, 329 U.S. at 84, a tax on coal sold, notwithstanding *Consol III's* application of the canon to redefine the *statutory* term "coal produced."

Under Export Clause jurisprudence, the government's benign characterization or labeling of a tax is not controlling when the operation and effect of the tax is to burden exports. 329 U.S. at 84. Even had the regulations employed the term "coal extracted," rather than the ambiguous "coal produced," the unambiguous terms of the regulations prescribing the *application* of the tax actually imposed the tax on coal when sold.[4] They will continue to do so unless

_____

government's citation to *Nufarm* is misplaced, because the statute and the Customs regulations in that case, unlike the OSM's regulations, actually provided for merely a deferral, until re-export of a good, of a duty that was calculated based on the good's condition in its state upon importation. 521 F.3d 1366.

[4] Although the government claims that administrative convenience led OSM to enact the regulations at issue, administrative convenience does not excuse the imposition of the tax on coal in the export stream in violation of the Export Clause.

7

and until they are revised, to conform with the new statutory definition of coal

produced.

### B. OSM's Actual Application of the Tax Has Been on The Processed Coal Product When Sold

OSM's actual application of the tax has consistently followed the regulations

imposing the tax on coal when sold and, conversely, *not* followed *Consol III's*

narrowing construction of the statutory term "coal produced" as "coal extracted."

Even regarding issues not specifically addressed by the regulations, such as

the determination of the tax rate applicable to coal whose taxable grade differs

between extraction and sale, or that is mined before a tax rate increase but sold

after the increase, OSM has applied or proposed to apply the tax in a manner

confirming its imposition on coal sold rather than extracted. See discussion, *infra,*

of *Wyodak Resources Development Corp. v. United States*, 637 F.3d 1127, 1130

(10th Cir. 2011), and of the effective date of the 2004 (and subsequent) tax rate

changes.  *See* 69 Fed. Reg. 56,122, 56,127-56,128 (Sept. 17, 2004), 73 Fed. Reg.

67,631(November 14, 2008), and 30 C.F.R § 870.13.

For example, in *Wyodak*, the issue was how to determine the rate of tax

applicable to coal of a low-taxable grade lignite, when it is in the ground, but

which, after commingling and processing with a high-taxable grade bituminous

coal, becomes part of a product whose average grade, at sale, qualifies as

bituminous. Tellingly, OSM determines the tax according to the grade of coal in its

condition when *sold*, rather than when extracted. It is untenable, then, for OSM to maintain that its tax is imposed on coal when extracted, *e.g.*, the lignite in the foregoing example, while at the same time actually imposing a tax rate associated with the *different* grade of coal -- bituminous -- being sold.[5] To be consistent with its litigating position, of course, OSM should be determining the rate of tax based on the grade of coal extracted. Its opposite practice only further confirms the complete nexus of the tax with the processed coal product when sold, and negates any nexus with coal extracted.

The government's response to producers' citation to *Wyodak* has been to divert attention from its true lesson. It argues that Wyodak did not seek to have the rate of tax determined based on the grade of coal extracted, but rather upon the grade of coal in the seam prior to extraction. That is irrelevant, however, for the focus is not on what coal Wyodak wanted to be the subject of the tax, but rather on the coal upon which OSM imposed the tax. Was it coal in the ground, or coal when sold? The answer, of course, is that OSM imposes the tax at the rate associated with the grade of coal *sold*. The government's own brief in *Wyodak* is revealing on this point:

---

[5] If Congress imposed a 4.0% tax on oranges, and a 4.5% tax on orange juice, it would be inconceivable that the 4.5% rate would be applied to the orange juice and yet deemed to be a tax on oranges. But that is the position adopted by OSM in regards to coal taxed at different rates based on different grades, when extracted versus when sold.

> Interior interprets the regulatory requirement to calculate the reclamation fee at the time of the first sale, transfer, or use of the coal to mean that **all parts of the fee, including whether the coal is subject to the rate for lignite or non-lignite coal**, must be determined at the time of that first transaction. That is a reasonable reading of the regulatory requirement to determine the fee at the time of the first transaction and it must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation."

2010 WL 2397310 (C.A. 10) (Appellate Brief) (emphasis added).

The government thus admits that not only is the tax rate determined based on coal sold, but it stresses that "all parts" of the fee are determined based on coal sold. Such emphasis supports producers' position that the reclamation fee is imposed on coal sold, as it excludes the possibility that *any* factor exists that would support, let alone establish, a nexus between the tax and the raw coal at extraction. Not surprisingly, the government's response brief in the instant appeal does not even attempt to identify such a factor. And how could it, when OSM's stated policy is that "all parts" of the fee are determined based on the coal when sold.

The same observation must be drawn from the 2004 regulations announced by the agency to implement a tax rate increase enacted by Congress, in circumstances where the coal is extracted before the effective date of the tax increase but sold after the tax increase. 69 Fed. Reg. 56,122, 56,127-56,128 (Sept. 17, 2004). OSM intended to increase the tax rate on all coal sold after the effective

date, regardless of whether it was extracted prior to that date. That is inconsistent with a tax on coal when extracted, and thus indicative of the agency's imposition of the tax on coal when sold. The government tries to diminish the significance of the 2004 regulations by saying there were never finally adopted, but OSM has adopted the same 2004 methodology to determine the effective date of subsequent tax rate increases. See 30 C.F.R § 870.13; 73 Fed. Reg. 67,631(November 14, 2008).

Yet all the government can muster in its answering brief is: "[T]he rule merely carried forward the previous regulatory regime that called for calculation of the fee at the time of first sale, transfer or use. The rule did not conclude that the tax was imposed on sales, as opposed to extraction." That response is a dodge. To say the rule merely carried forward the previous regulatory regime is no valid rebuttal to the producers' point, which is that the *rate of tax* goes to the essence of the *object of the tax*, and the 2004 regulation determined the rate of tax based on coal sold rather than coal extracted. If the coal was sold after the effective date of the tax increase, it would be taxed at the higher rate, regardless of when it was extracted. That tax bears no relationship to extraction.

These examples of the agency's actual application of the tax lead to the ineluctable conclusion that the only "nexus" between the tax and extracted coal is the government's litigating position that this is a tax on extracted coal. All

11

objective indications, however, are of a tax imposed on the processed coal product when sold – which is also consistent with the conclusion drawn by the D.C. Circuit in *Drummond Coal Co. v. Hodel,* 610 F. Supp. 1489 (D.D.C. 1985), *aff'd,* 796 F.2d 503 (D.C. Cir. 1986), discussed in Section D, *infra*, that OSM and its regulations imposed the reclamation fee on coal at the point of its sale.

### C. The Reclamation Fee Is Not an Extraction Tax That Is Deferred Until Sale -- It Is Imposed On The Processed Coal Product When Sold Because It is Upon the Condition of That Coal, Rather Than Raw Coal at Extraction, That OSM Assesses the Tax

*Consol V* rationalized the constitutionality of the tax by accepting at face value, and without any explanation, the government's argument that OSM merely defers the collection of the tax until the coal is sold. It did so in the face of producers' demonstration that the tax has every nexus with the processed coal product when sold, and none with extraction, other than the government's mere labeling of the tax as one imposed on extraction and the recent reinterpretation of the statutory term "coal produced" as coal extracted.

Not only does this conflict with the Supreme Court's rule that the operation and effect of a tax should determine whether it violates the Export Clause, it also directly conflicts with this Court's own holding in *Nufarm*, 521 F.3d at 1369. In that case, a customs duty that was assessed based on the condition of goods in their condition as imported, rather than when re-exported, was found to be imposed upon importation and its collection merely deferred until re-exportation.

Unlike OSM's regulations, which assess the tax with reference to coal when sold, the regulation challenged by the *Nufarm* exporter, 19 C.F.R. § 181.53, expressly refers to a duty on imports:

> Where a good is *imported into the United States* pursuant to a duty-deferral program and is subsequently withdrawn from the duty-deferral program for exportation to Canada or Mexico or is used as a material in the production of another good that is subsequently withdrawn from the duty-deferral program for exportation to Canada or Mexico… the documentation required to be filed under this section in connection with the exportation of the good shall, for purposes of this chapter, constitute an entry or withdrawal for consumption and the exported good shall be subject to duty which shall be assessed in accordance with paragraph (b) of this section.

19 C.F.R. § 181.53(a)(2)(i)(A) (emphasis added).

Thus, as noted in *Nufarm*, the regulation begins with reference to "a good imported into the United States." The terms "exportation" or "exported good" are each, in turn, merely references back to the imported good.

Particularly relevant to the reclamation fee, however, is *Nufarm*'s emphasis on Customs' assessment of the duty on the goods on the basis of their condition at the time of importation:

> Sub-section (b), referenced in the last line of [Section 181.53(a)(2)(i)(A)], states:
>
>> [W]here a good, regardless of its origin, was imported temporarily free of duty for repair, alteration or processing (subheading 9813.00.05, Harmonized Tariff Schedule of the United States) and is subsequently exported to Canada or Mexico, *duty shall be assessed on the good on the basis of its condition at the time of its importation into the United States.*

> Such duty shall be paid no later than 60 calendar days after either the date of exportation or the date of entry into a duty-deferral program of Canada or Mexico, except that, upon filing of a proper claim under paragraph (a)(3) of this section, the duty shall be waived or reduced in an amount that does not exceed the lesser of the total amount of duty payable on the good under this section or the total amount of customs duties paid to Canada or Mexico.
>
> 19 C.F.R. § 181.53(b)(5) (emphasis added). This subsection assesses the duty on the import *based on its condition at the time of importation, thus further distinguishing this fee from an export tax or duty.*

521 F.3d at 1369 (emphasis added).

Just as in *Nufarm*, where the Federal Circuit found determinative that the duties were assessed on the goods in their condition as imported, so must this Court find it determinative that OSM assesses that tax on the processed coal product based on its condition at the time of sale.[6]

Nor is the taxation of coal sold negated by the mere presence in the regulations of the term "coal produced," even though that term in the statute has now been deemed to mean coal extracted. *Nufarm* addressed a similar

---

[6] The government has implied that because producers choose to sell clean coal, which is a processed product distinct from raw coal, producers cannot challenge the imposition of the tax on the coal sold because they "cannot render the AML fee unconstitutional by their unilateral business decisions." Gov't. Br. at 15n.3. But that turns Export Clause jurisprudence on its head. It has always strived to provide exports with unqualified immunity from taxation, without regard to the type or condition of the goods being exported. The world market typically demands clean coal and the producers sell that product, not to render the tax unconstitutional, of course, but to meet demand. It is *OSM's* regulations and actions, imposing the tax on the processed coal product when sold, that renders the tax unconstitutional.

circumstance, and found that an isolated term in the regulations did not alter the

meaning and operation of the regulations as a whole:

> This court appreciates that an isolated clause from 19 C.F.R. §
> 181.53(a)(2)(i)(A) states that "the exported good shall be subject to
> duty...." Similarly, another isolated phrase observes that "*where a
> good ... was imported* temporarily free of duty for repair, alteration or
> processing ... *and is subsequently exported* to Canada or Mexico, duty
> shall be *assessed on the good*." (emphases added). Taken out of
> context, those passages suggest an impermissible tax or duty on
> exports. These excerpts, however, are merely isolated strands of the
> entire fabric of the regulation. When those strands are woven back
> into the fabric where they belong, the entire context shows that the
> regulation imposes a duty on imports, not exports. The opening phrase
> of the regulation refers to the "imported" good. All later "exported
> goods" passages are merely references, in different terms, to the
> imported goods.
>
> Moreover the phrase "the exported good shall be subject to duty"
> reads in context "the exported good shall be subject to duty which
> *shall be assessed in accordance with paragraph (b) of this section*."
> 19 C.F.R. § 181.53(a)(2)(i)(A) (emphasis added). The reference to
> paragraph (b), as noted earlier, assesses the duty on the good as an
> import and in the condition of the good at the time of import, even
> though the regulation defers collection until the time of export.
>
> Thus, the entire regulation, read in context, refers to a duty on imports
> deferred until the time of export. The duty, however, is a tax on
> imports, not exports.

521 F.3d at 1369.

Likewise, in the instant case, "the entire regulation" requires the assessment

of the reclamation fee on coal based on its condition upon sale, which occurs in the

export stream. The ambiguous term "coal produced," though present in the regulations, is but an "isolated strand[] of the entire fabric of the regulation. When [that] strand[] [is]woven back into the fabric where [it] belong[s], the entire context shows that the regulation imposes a [tax on coal when sold] not [extraction]." *Id.*

### D. The *Drummond* Courts' Finding That OSM Actually Imposed the Tax on Coal Has Retained Its Relevance Notwithstanding *Consol III's* Application of the Constitutional Avoidance Canon to Reinterpret "Coal Produced"

In *Drummond*, the courts had to determine the nature of the tax imposed by OSM through its regulations before they determined whether the agency employed a reasonable interpretation of "coal produced." The district court found that the "regulations adopt the first of the two possible interpretations of section 1232," *id*. at 1498 – *i.e.*, that "coal produced" includes "the entire process of extracting and selling coal." *Id*. at 1497. The D.C. Circuit affirmed, stating: "'Production' could reasonably be interpreted to include the entire process of extracting and selling coal, complete from pit to buyer's door, or it could refer solely to the process of extraction.'" 796 F.2d at 505 (quoting 610 F. Supp. at 1497). The *Drummond* decisions thus confirm that OSM, through its *regulations*, has in fact long-imposed the reclamation fee on coal through its sale, rather than solely on its extraction.

The government, in its attempt to distinguish *Drummond*, offers only that the courts ("and the regulation they reviewed") never held that the statute imposed a tax on extraction or sales "for purposes of the Export Clause." Gov't. Br. at 13.

That is an admission that *Drummond* indeed found, as producers maintain, that OSM applied the tax to coal sold rather than extraction. And given that finding in a non-Export Clause context, the same courts, *a fortiori*, would have made the same finding in an Export Clause context such as this, as they were bound to uphold the prohibition against *any* burden on exports, much less the clear and comprehensive burden imposed by OSM's regulations on the processed coal product sold in the export stream, and in the absence of any nexus between the tax and extraction.

The government also contends that *Drummond* should be ignored because "even if OSM had previously adopted an interpretation of 'coal produced' as extending through the sale of coal, the [Federal Circuit] was required, as a matter of constitutional avoidance, to adopt an interpretation of 'coal produced' as equivalent to 'coal extracted.'" Gov't. Br. at 13. That point goes nowhere, for regardless of whether *Consol III* was correct in narrowing the meaning of the statutory term coal produced, the constitutional avoidance doctrine cannot be applied to rewrite regulations that, in clear and unambiguous terms, imposed the tax on coal when sold.

The government then cites to *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) and *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984), for the proposition that an agency is free to revise its interpretation of the statute, in this case the statutory term "coal

produced," as if OSM has already done so in connection with its imposition of the taxes at issue herein. However, OSM has *not* done so. Indeed, as manifest by its continued application of the materially identical regulations, OSM *never* revised its interpretation of coal produced -- neither after *Drummond*, nor even after *Consol III* held that the term can now be reinterpreted as "coal extracted."

In a final attempt to avoid the impact of *Drummond*, the government claims that OSM actually *has* revised the regulations, insofar as post-*Drummond* it has permitted excess moisture to be excluded from the post-extraction substances against which the tax is imposed. OSM's decision to exempt excess moisture, however, does not demonstrate that the current regulations no longer impose the tax on coal when sold. One of the many reasons why the tax must be found to be imposed on coal sold rather than extracted is that OSM requires that even *non-extracted* substances, as long as they are present in the sold product, must be included in the tax calculation. By exempting "excess moisture" alone, OSM only reinforced its *general* rule that post-extraction substances be included as a subject of the tax.

### E. *Liggett* Provides No Valid Authority for Holding That OSM Imposes the Tax On Coal Extracted, and Its Adoption by *Consol V* Opens a Wide Gap in Export Clause Protection

The government concedes that the Supreme Court in *Liggett* "did not confront the Export Clause." Nonetheless, it attempts to justify *Consol V*'s reliance

on *Liggett* by contending that the distinction the Court drew between fee liability and fee collection is not specific to the doctrine of state immunity from federal taxation. But the particular *analysis* required in the context of the Export Clause differs in crucial respects from that applied by *Liggett* to determine whether state immunity was violated.[7]

First and foremost, the doctrine of governmental immunity requires the court to determine whether the tax imposes a *direct* burden on the state. That is a more demanding test for the invalidation of a tax than that required by the Export Clause, which bars *any* tax on exports. "No tax …shall be laid" is an unqualified

[7] Moreover, the first of the three non-governmental immunity cases cited by the government as examples where the fee liability versus fee collection distinction was determinative, *Nufarm,* 521 F.3d 1366, presented a tax or duty that indeed was imposed prior to export, and thus was materially distinguishable from the tax contested herein. In *Nufarm*, this Court correctly found that a customs duty imposed on an import only had its collection deferred until exportation, and so held because the Customs regulation provided that: "duty shall be *assessed on the good on the basis of its condition at the time of its importation* into the United States." *Id*. at 1369 (citing 19 C.F.R. § 181.53(a)(2)(i)(A)). By contrast, the reclamation fee is assessed on the basis of its condition (weight, value, grade, non-extracted substances) at the time of the good's *exportation* from the United States.

The second case, *Ammex, Inc. v. United States*, 419 F.3d 1342 (Fed. Cir. 2005), simply held that the imposition of a tax does not mean that it has also been assessed. It did not establish, as did *Liggett*, a criterion for determining whether a tax may be considered imposed on "sales," rather than on the previous event of manufacture.

The third case, *Reynolds Tobacco Co. v. Robertson*, 94 F.2d 167 (4th Cir. 1938), decided on the heels of *Liggett*, has implicitly been overruled by Supreme Court precedent insofar as the Fourth Circuit erroneously applied the governmental immunity criteria and withheld Export Clause protection against a tax because it was not an *ad valorem* sales tax. See discussion, *infra*, at 21, of *IBM* and *Shoe*.

prohibition that has been interpreted as shielding exports *from any burden whatsoever*. And the burden that violates the Export Clause is imposed on *exports*, whereas the governmental immunity doctrine addresses burdens on a *state*. Either of these distinctions, which the government does not even attempt to dispute, is sufficient by itself to render *Liggett* irrelevant in determining whether OSM's tax violates the Export Clause.

Second, and because it was seeking to identify a "direct burden" on state government, the Court established that the tax had to be imposed on the sale of the tobacco—in other words, it had to be a sales tax. In the instant case, it so happens that the coal is sold while it is in the export stream, but the Export Clause protection is invoked not by the sale, but by the export. An Export Clause violation need not even involve a sale, let alone an *ad valorem* sales tax.[8] The text refers to exports, not sales. After all, the exported good can be transferred from one division of a company to another, or it can be the subject of a consignment or a lease. Certainly, the government is not contending that the Export Clause permits it to tax exports that are not sold. It must be aware that in order to protect exports, the Supreme Court has found that an Export Clause violation resulted from a tax imposed not even on the exported goods themselves, but on the premiums paid to

---

[8] In *Consol V*, producers did emphasize that the reclamation fee is determined based in part on the value of the coal at sale, but without explanation the panel ignored this characteristic of the fee when it held that it did not qualify under the *Liggett* standard, which required a tax that varied as a function of the sales price.

insure the goods, *United States v. IBM*, 517 U.S. 843, 848 (1996), and a tax imposed on the loading of the goods, *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). These decisions confirm that, as adopted by *Consol V*, the *Liggett* analysis requiring a sales tax affords exports insufficient protection and is entirely inappropriate in determining an Export Clause violation.

Third, and further compounding the mistake of the panel's reliance on *Liggett*, the Supreme Court's test for a sales tax was whether the amount of the tax was calculated as a function of the sales price. In other words, unless and until *Consol V* is expressly overruled, the protection afforded under the Export Clause will be limited to *ad valorem* taxes, and not include taxes whose amount has been calculated based on a unit of physical measurement, such as weight, volume, or units.

That substantially undermines the scope of the protection intended by the Framers when they barred any burden on "exports," and permitted no qualification whatsoever. They didn't intend to limit the protection to exports subject to an *ad valorem* sales tax, and indeed the text of the Clause does not impose any such limitation. Nor has the Supreme Court ever recognized such a limitation.  Indeed, having held taxes on the insurance of exports, and taxes on the loading of exports, respectively, to violate the Export Clause, *IBM* and *Shoe* have implicitly overruled *Reynolds'* adoption, as the test for determining an Export Clause violation, of the *Liggett*

requirement of an *ad valorem* sales tax. *En banc* review of this case is required to

address the inconsistency between *Consol V* and the Supreme Court's holdings in

*IBM* and *Shoe*, and restore the protection of exports from all taxes, not merely *ad*

*valorem* sales taxes.[9]

---

[9] The government downplays the importance of this case by claiming that producers have acknowledged that they remain "statutorily obligated to pay AML fees on the extracted coal"…" if the regulations were unconstitutional." Gov't. Br. at 15n.3. Producers have neither acknowledged nor implied any such thing.

Likewise mistaken is the government's contention that producers' damages would consist of the difference in the amount of tax based on coal extracted versus coal sold. As amply demonstrated based on well-established case law, the *entire* tax violates the Export Clause, not merely a portion of it, and under the authority of the Tucker Act, 28 U.S.C. § 1491, and of this Court's holding in *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed. Cir. 2000), *reh'g denied*, June 8, 2000, *cert. denied, U.S. v. Cyprus Amax Coal Co.*, 532 U.S. 1065 (2001), monetary damages in the amount of the tax are payable to the producers. The government's citation to *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dept. of Bus. Regulation of Florida*, 496 U.S. 18 (1990), for the proposition that the government could cure the Export Clause violation by "refunding the difference between the unconstitutional tax assessment and a constitutional one" ignores that while in *McKesson* the State of Florida had the option to cure a Commerce Clause violation occasioned by its imposition of taxes in a manner discriminating against non-resident taxpayers, the violation did not entitle the taxpayers to "damages" in the form of a refund of the taxes they paid. Rather, the tax only had to be rendered non-discriminatory. *Id.* at 19.

Export Clause violations, however, entitle the exporter to damages in the amount of the unconstitutional tax that was imposed upon their goods. The payment of such damages does not constitute a refund of the taxes, or negate the previous imposition of those taxes by OSM. Accordingly, and contrary to the government's suggestion, the government would not be able to impose these taxes a second time. They were paid and are not delinquent.

## II.    *Consol V* Misapplied the Constitutional Avoidance Canon By Deeming OSM's Application of the Tax to Be on Coal Extracted When In Fact OSM Has Yet to Conform Its Regulations and Practice to This New Interpretation of Coal Produced

The producers and Constitutional Law Professors have demonstrated that the panel in *Consol V* misapplied the constitutional avoidance canon when it re-characterized OSM's regulations and conduct as consistent with the Export Clause, even though they still operate to impose the tax on coal sold.

The government has offered no rebuttal. All it can muster is that "[e]ven if OSM had previously adopted an interpretation of "coal produced" as extending through the sale of coal, this Court was required, as a matter of constitutional avoidance, to adopt an interpretation of coal produced as equivalent to "coal extracted." It then cites to *Edward J. De Bartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988), in which the court, in a normal application of the avoidance canon, declined to adopt an agency's statutory interpretation which previously had been afforded *Chevron* deference.

By thus seeking to divert the court's attention to whether OSM *may* reinterpret the statutory term "coal produced," the government is sidestepping the relevant point, which is that OSM has not *in fact* reinterpreted the statutory term, let alone revised its regulations or conduct so that it no longer imposes the tax on the processed coal product when sold.

What an agency is permitted to do and what it in fact does are obviously two different things, and the panel should not have used the avoidance canon to deem OSM to have acted in conformance with the revised interpretation when it has not, and does not even plan to do so. Such application of the canon is unprecedented, and flies in the face of all judicial precedent and reason. "It threaten[s] to vitiate the elemental protection of the Export Clause, and to establish 'a radical new version of the avoidance canon [that] effectively *narrows* the operative force of constitutional principles…in a broad range of challenges to government action.'" Constitutional Law Professors, at 3, 5.

### III.   *Consol V* Failed to Apply the Standard Required By The Supreme Court In Evaluating OSM's Interpretation of the Statute and Its Own Regulations

Under Supreme Court jurisprudence, an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997). *Consol V* failed to hold OSM to this standard. If the term "coal produced" in the regulations is deemed to mean coal extracted, then OSM interpreted those regulations erroneously and inconsistently with "coal produced" through its promulgation and enforcement of provisions imposing the tax on the processed coal product when sold, that is on the weight, value, and grade, and upon the substances present at sale regardless of their presence at extraction.

## CONCLUSION

The panel's decision in *Consol V* was in error and should be overruled by

the *en banc* court.

Dated: January 17, 2013

Respectfully submitted,

/s/ Steven H. Becker
BECKER LAW FIRM PLLC[10]
600 Third Avenue
New York, New York 10016
Tel: (212) 499-9098

/s/ Robert M. Rolfe
HUNTON & WILLIAMS[11]
951 East Byrd Street
Richmond, Virginia 23219
Tel: (804) 788-8466

/s/ Charles H. Critchlow
/s/ Lindsay A. Minnis
BAKER & McKENZIE LLP[12]
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 626-4100

/s/ John Y. Merrell, Jr.
MERRELL & MERRELL, P.C.[13]
1477 Chain Bridge Road, Suite 101
McLean, Virginia 22101
Tel: (703) 790-8440

---

[10] Counsel for Appellants in Case Nos. 12-5090, -5091, -5092, 5093, -5094, -5095, -5133, excluding Peabody Holding Company, Inc., Powder River Coal Company, Twentymile Coal Company, and Mid-Vol Leasing, Inc.

[11] Counsel for Appellants in Case No. 12-5121.

[12] Counsel for Appellants Peabody Holding Company, Inc., Powder River Coal Company, Twentymile Coal Company, and Mid-Vol Leasing, Inc.

[13] Counsel for Appellants in Case No. 12-5134.

# United States Court of Appeals
## for the Federal Circuit

## CERTIFICATE OF SERVICE

I, Natasha S. Johnson, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Counsel for Plaintiffs-Appellants to print this document.  I am an employee of Counsel Press.

On **January 17, 2013**, Counsel for Appellants has authorized me to electronically file the foregoing **Joint Reply Brief of Plaintiffs-Appellants** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

TARA K. HOGAN
DEPARTMENT OF JUSTICE
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-2228
Attorneys for Defendant-Appellee


Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Natasha S. Johnson
Natasha S. Johnson

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*Aracoma Coal Company v. US*
Appeal No. 2012-5090

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that this brief complies with the type-volume limitations of Fed. R.App. P. 32(a)(7)(B)(i). This brief was printed using a 14 point Times New Roman font and contains 6,640 words as calculated by the "Word Count" feature of Microsoft Word 2010, the word processing program used to create it.

Dated: January 17, 2013                By:    /s/ Steven H. Becker
                                              Steven H. Becker
                                              BECKER LAW FIRM PLLC
                                              600 Third Avenue
                                              New York, New York 10016
                                              (212) 499-9098

                                              *Attorney for Those Plaintiffs-*
                                              *Appellants Indicated in Brief*